UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 06-80158-Cr-Ryskamp/Hopkins

UNITED STATES OF AMERICA
                    Plaintiff,

vs.

ANTHONY R. MASILOTTI,
                    Defendant.
_____/

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO
PRESENTENCE INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

The United States of America, by and through its undersigned Assistant United States Attorney, files this response to defendant Anthony R. Masilotti's objections to the Presentence Investigation Report ("PSR") and its Sentencing Memorandum as follows:

**A.      Defendant's Objections.**

The defendant has raised through letter to the United States Probation Office certain factual objections to the PSR, the majority of which have been resolved.[1]  Further, each and every one of the defendant's objections do not affect the Sentencing Guideline computation.  If the Court determines that the disputed factual matters will not affect the Court's sentencing determination then they need not be resolved.  *See* FRCP 32(i)(3)(B).  Briefly, in his first objection, Masilotti points to the Plea Agreement as the polestar governing his agreement to forfeit certain assets.  The PSR does nothing different. The defendant's objection to paragraph 4 of the PSR is, therefore, misplaced and

---

[1]  The United States agreed to certain minor changes in adjectives used to describe some of Masilotti's actions in ¶¶ 26 and 29.

should be denied.  The defendant's other objections to the wording in ¶¶ 76 and 78 were resolved by the agreement of the United States Probation Office to make the requested changes or additions to the PSR.  The United States took no position on these factual matters as they did not involve any aspect of the crime committed by the defendant.  It appears those objections have likewise been resolved.  Finally, the defendant was not assessed a role assessment pursuant to USSG § 3B1.3 because his role as an elected public official is already taken into consideration in the calculation of the defendant's base offense level under USSG § 2C1.1.

**B.      Sentencing Memorandum.**

**1.      Factual Background.**

Defendant Anthony R. Masilotti served as an elected Palm Beach County commissioner from 1998 through 2006.  Masilotti served District 6, which district generally covered the western portions of Palm Beach County, including the municipalities of Royal Palm Beach, where Masilotti also served as Mayor from 1992-1998, Wellington, Belle Glade, and Pahokee.  Masilotti was re-elected to a second four year term as commissioner in 2002.  As a sworn public official, Anthony R. Masilotti had a legal and ethical responsibility to perform his duties free from fraud, self-enrichment and self-dealing. Masilotti also had an obligation to disclose personal financial interests that might affect his actions as a public official.  Masilotti knowingly failed to follow these obligations on several occasions and conspired with others to defraud the public of their right to Masilotti's honest services.

As set forth in the PSR, Masilotti became financially involved in several projects on which he either voted or used his good office to exert his political will which actions all inured to his considerable financial benefit.  Masilotti utilized his public position as a county commissioner to

2

advance and conceal his secret financial interest with others in three separate real estate transactions and also his receipt of significant gratuities from a former commercial developer who did business with Palm Beach County.

*Martin County and Nine Gems*

The first project involved a land deal in Martin County, which involved about 3,500 acres of real property known as Nine Gems.  In that transaction, Masilotti provided $275,000 in down payments to brothers Jeff and David Lee by February 2002 to eventually secure 150 acres of this land.  Masilotti had met the Lees through the Lees' attempts to develop their family farm, Black Diamond Nurseries, located in Masilotti's commission district.  Masilotti informed the Lees as early as his first $25,000 payment to them in October 2000, that he wanted to keep his ownership interest in this real property concealed.  After establishing a financial relationship with the Lees, Masilotti met with county personnel to assist the Lees in their traffic concurrency issues related to their Black Diamond project.  The purchase price given to Masilotti was below market value, and lower than earlier sales of larger pieces of property to longtime Lee family friends and business associates. Further, the Masilotti parcel was at a much more valuable location than the other purchasers of portions of the Nine Gems tract.  The price and location given to Masilotti obviously reflected the Lees' gratitude for Masilotti's official actions in helping the Lees through the Black Diamond project.

In or around July 2002, Masilotti contacted West Palm Beach attorney William R. Boose, III for the purpose of assisting him in Masilotti's purchase of a parcel of land in the Nine Gems tract. Boose regularly appeared before the County Commission as a lobbyist representing developers seeking land use changes and other considerations requiring commission vote.  Boose then created

a Florida land trust naming Richard C. Crum as Trustee, and Masilotti's then-wife, Susan L. Masilotti, as the sole beneficiary. The Crum Trust was created for the purpose of keeping Masilotti's ownership interest hidden from the public in order that he could later take official action to increase the value of the land without disclosing his financial interests.

In September 2002, the Crum Trust bought the approximate 150 acre parcel of land in the Nine Gems tract from the Lee brothers.  Masilotti provided all of the funding from his family assets, even though his wife provided a check to the Boose law firm that made it appear that the investment was hers alone.  Boose also agreed to provide this legal service to Masilotti without charge, and only assessed Masilotti for expenses and paralegal time.  During the time that Boose represented Masilotti for no fee, Masilotti participated on voting on Boose projects, including voting for Boose to represent Palm Beach County in a $50 million waterfront bond issue without disclosing the free legal services Boose was providing to him.[2]

On July 16, 2003, Masilotti participated in a joint meeting of the Palm Beach and Martin County Commissions in Jupiter, Florida.  At that meeting, Masilotti advocated for the purchase of the Nine Gems tract by the South Florida Water Management District ("SFWMD"), which would have included land owned by the Crum Trust. At that time, Masilotti intentionally failed to disclose that he had a financial interest in the land through the Crum Trust, and that Masilotti and his family would benefit personally if the land was sold to a public entity.

On August 21, 2003, Masilotti briefly attended a meeting at the SFWMD and again voiced his support as a Commissioner for the proposed public purchase of the Nine Gems parcel.  Masilotti

---

[2]  Neither Boose nor his law firm did any bond work, but instead, referred out this county bond work to a separate law firm not appointed by the county commission.  Boose ultimately shared legal fees connected with this work with that other attorney.

again failed on this occasion to disclose that he or his family had a financial interest in the proposed purchase.

In November 2003, as a further part of the conspiracy to keep Masilotti's financial interest in Nine Gems concealed, upon direct inquiry by the SFWMD as to the true identity of the Crum Trust beneficial owners, the attorney for the Lees falsely identified the Lees as the Crum Trust owners. The Board of the SFWMD relied on this false information to authorize the expenditure of $46 million in public funds to purchase the Nine Gems tract.

In March 2004, as the time for signing a contract for the actual sale of the Nine Gems tract approached, Masilotti participated in a conference call between William R. Boose, III, Jeff Lee, David Lee, and the Lees' attorney. At that time, Masilotti was aware that the beneficial ownership affidavits of the Crum Trust would be required for the closing with the SFWMD. To avoid that disclosure, and to keep Masilotti's financial interest concealed, Masilotti endorsed the idea of a land exchange that would allow his interest to remain hidden. In the conference call, Masilotti and Boose demanded an exchange of land with the Lee brothers that would remove the Crum Trust from owning any land to be sold to the SFWMD. Boose and Masilotti also required that the Lees pay the closing costs of such an exchange and further demanded that they allow Masilotti to select certain acreage in the future once the Lees bought back from Masilotti 110 acres of land.

As a result of this land exchange, Masilotti's ownership interest remained hidden. When the South Florida Water Management District paid the Lees for part of the Nine Gems tract in a staggered closing, the Lees in turn used some of those proceeds to buy back a 110 acre tract from the

Crum Trust. As a result of this transaction, Masilotti and his family received $1.7 million, which Masilotti divided with his wife.[3]

Later, in October 2004, when it became apparent that the Lees would not allow Masilotti to select any 40 acres he wished, Masilotti communicated to Boose a threat which was intended to be communicated to the Lees' attorney that Masilotti would use his public position to make trouble for the South Florida Water Management District in future closings with the Lees.

*Diocese Transaction*

In the real estate transaction involving lands owned by the Diocese of Palm Beach, Masilotti used his public office to advocate the sale of the Diocese land to co-conspirator Daniel N. Miteff and Miteff's partners. Masilotti also used his position as county commissioner to steer the sale to Miteff. Masilotti took this action without disclosing that he expected to be compensated–and later was in fact compensated–by Miteff for his efforts on Miteff's behalf. To ensure that Miteff's bid was accepted by the Diocese, Masilotti strong armed the Diocese-retained real estate agent to select the bid that provided for a public park–only Miteff's bid--and used the threat that traffic concurrency would not be granted by the county if any other bid was accepted. When Miteff's financing dried up and the Diocese was threatening to cancel the contract, Masilotti and Miteff recruited the Lee brothers to join in this venture. The Lees eventually provided all of the earnest money required under the contract.

Later, during meetings with the county engineer concerning traffic concurrency issues on the Diocese property, both Miteff and Masilotti intentionally failed to disclose Masilotti's concealed

---

[3] Masilotti's ex-wife voluntarily forfeited $400,000 of those proceeds to the United States.

financial interest to the county engineer or his staff.  Masilotti also did not disclose to the county engineer or his staff that he had a financial partnership with the Lees in a parcel of real estate in the Nine Gems tract in Martin County, Florida.

After Miteff successfully 'flipped' the Diocese property contract to GL Homes, Masilotti was paid approximately $50,000 by Miteff.  That payment covertly took place at Atlantis Hotel and Casino in Nassau, Bahamas in February 2004 by Miteff paying Masilotti most of this money in gaming chips.

*Palm Beach Aggregates*

In late 2003, Masilotti devised a scheme to secretly purchase sixty (60) acres of land within a larger 1,200 acre tract owned by Palm Beach Aggregates and then use his official position to substantially increase its value.  This land lay within unincorporated central Palm Beach County. Tomeu had been trying to obtain favorable consideration from the Village of Wellington since July 2003 to annex this tract of land, in hopes of changing the land use designation of this property to build approximately 2,000 homes.[4]  After a few rebukes, Masilotti then had his brother, Paul F. Masilotti convince the President of Palm Beach Aggregates, Enrique Tomeu, to sell to him an option on 60 acres of land.

---

[4] Although not part of this 1,200 acres, Palm Beach Aggregates owned an additional 2,800 acres of unimproved land contiguous with the 1,200 acres earmarked for residential development.  On this additional Aggregates-owned land, Florida Power and Light was in the process of building a controversial power plant.  Masilotti had often and repeatedly voiced opposition to this plant, consistent with the majority of his constituents.  On February 24, 2004, at a commission vote for the FPL plant, Masilotti unexpectedly switched his vote approving the power plant modifications.  By that time, Tomeu had accepted the Masilotti request to 'buy in' to the 1,200 acres with a 60 acre option agreement.  Masilotti failed to disclose his financial relationship with Tomeu prior to this vote.

The option price was $100,000 and allowed the purchase of 60 acres of land for $1.8 million. This option was never recorded with the Palm Beach County Clerk of Court. Anthony Masilotti and his brother Paul Masilotti formed a trust, the ARM Family Land Trust, that would list Paul Masilotti as the sole beneficiary, but in reality would be used to hide Anthony Masilotti's concealed partnership interest with Paul Masilotti in the option agreement.

On April 13, 2004, defendant Masilotti appeared as a County Commissioner at a meeting of the Village Council for the Village of Wellington, and advocated for the annexation of the Palm Beach Aggregates' 1,200 acre parcel by the Village of Wellington without disclosing his or his brother's financial interest in the property. Masilotti knew at the time that such annexation would allow for residential development of the 1,200 acres of land owned by the Aggregates, and that accordingly the value of the 1,200 acres would increase astronomically. Because of citizen outcry against annexation and residential development of this property, the Village of Wellington tabled the issue of annexation of the 1,200 acre Aggregates tract at this hearing.

Less than two weeks after the Wellington Village Council tabled the annexation proposal, Masilotti participated in a meeting of the Palm Beach County Commission where a discussion ensued regarding the possibility of giving Palm Beach Aggregates the same residential development rights as might be granted by Wellington, but only if the Aggregates agreed to stay in unincorporated Palm Beach County. During this discussion at commission meeting of April 22, 2004, Masilotti intentionally failed to disclose that he held a concealed financial interest in the 1,200 acres of land being considered. Masilotti voted in favor of this measure and the county commission voted to award Palm Beach Aggregates a land use change permitting residential development of this tract of land at 2 units an acre.

In order to cash out of the scheme without getting caught, Masilotti devised another land swap. In February 2005, the Aggregates purchased a 300 acre tract of land in Brevard County, Florida for approximately $7.7 million through Micco Eastern Holdings, LLC ("Micco Eastern"), a corporation created solely for the purpose of this land purchase. The land had previously been identified by defendant Masilotti and his brother, who were planning a land swap to conceal the scheme.

In March 2005, Lennar Homes signed a contract for the purchase of the 1,200 acres from Palm Beach Aggregates for $300 million. In that contract, Aggregates represented that it owned in fee simple the entire 1,200 acre tract, or would do so by closing. Therefore, it became imperative to buy out Masilotti's option. In April 2005, the ARM Family Land Trust agreed to release its option to buy 60 acres of land inside the 1,200 tract. In exchange for the release of the option, Palm Beach Aggregates, as the sole member of Micco Eastern Holdings LLC, agreed to transfer 100% beneficial control and ownership of Micco Eastern to the ARM Family Land Trust. No deed was recorded in Brevard County to reflect this change in beneficial ownership. As a result of this transfer and exchange, Anthony Masilotti's interest remained concealed at all times, as did the fact that for payment of just $100,000, Anthony Masilotti and Paul Masilotti received property worth approximately $8 million.[5]

*Bruce Rendina and the Posse Property*

From around May 2003, and continuing through around October 2005, Anthony Masilotti, Masilotti's family members and friends, accepted from Bruce A. Rendina, a real estate developer

---

[5] Palm Beach Aggregates never collected on the remaining $1.7 million due under the option.

in Palm Beach County, approximately $100,000 in charter plane flights to Nassau, Bahamas and elsewhere.

On January 13, 2004, Anthony Masilotti, acting as a county commissioner, voted to accept Bruce A. Rendina's bid for the purchase of approximately 10 acres of county-owned land, known as the Posse Property.  At that time, Masilotti failed to disclose his concealed financial relationship and substantial gifts from Rendina.

On July 12, 2004, Anthony Masilotti, acting as a county commissioner, met with Palm Beach County officials and discussed the Posse Property purchase by Rendina and failed to disclose his concealed financial relationship and substantial gifts from Rendina.

On February 15, 2005, Anthony Masilotti, acting as a county commissioner, voted to accept the contract between Palm Beach County and Rendina for purchase of the Posse property.  Masilotti again failed to disclose his concealed financial relationship and substantial gifts from Rendina.

### 2.    Sentencing Considerations.

In determining a reasonable sentence, the Court must consider the following factors enumerated in 18 U.S.C. § 3553(a):

*Nature and Circumstances of the Offense*

The instant offense involved willful violations of Masilotti's duty to provide his objective and conflict-free decisions as a county commissioner to the citizens of Palm Beach County.  As set forth in the PSR and this Memorandum, the defendant's crimes were egregious violations of the public trust designed to financially better himself to the tune of nearly 10 million dollars.  The facts alarmingly demonstrate that Masilotti came to view his good office as a position to garner substantial benefits for himself, his family and friends and from which he could coerce and strong arm those

unwilling to do his bidding through threats of financial retaliation.  Self dealing, concealment of financial interests, and concealment of financial relationships with individuals appearing before his body became a way of life of Masilotti's from the dais.

*History and Characteristics of the Defendant*

When confronted with the evidence against him, Masilotti accepted responsibility and admitted to his crimes.  He agreed to cooperate with the FBI and IRS, has submitted to numerous debriefings and continues to express his willingness to cooperate.  Masilotti agreed to forfeit the vast majority of his ill-gotten gains and has cooperated with authorities in ensuring that the necessary paperwork was executed forfeiting those assets to the United States.  Finally, Massilotti agreed to plead guilty and accept his punishment without undue delay or excuse.  Of course, the defendant's crimes would never have come to light but for a thorough and detailed investigation by the FBI and IRS.  This is not a case where the defendant came forward and admitted to his crimes without confrontation.  Further, the defendant, in his attempts to conceal his crimes during the course of the investigation was not truthful with the FBI during two separate interviews in May 2006.

*Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Deterrence, and Protect the Public*

The maximum period of 60 months' incarceration is necessary to accomplish these paramount sentencing objectives.  Any felonious criminal conduct by an elected public official is a serious matter.  Where that conduct is calculated, willful, and accompanied by efforts to conceal the truth, it becomes even more serious.  When a lawmaker becomes a law breaker, the public loses significant respect for the law and the political system.  The sentence imposed must be sufficient to restore public confidence.  While public confidence in the system is a paramount sentencing

objective in this case, deterrence is another.  A 60 month sentence is necessary to deter other similarly-thinking public officials from believing that this type of betrayal of the public trust will either be tolerated or punished lightly.  The punishment here must make the temptation of self dealing by any public official not worth the consequences meted out for such actions.

*Sentencing Guidelines Range*

The correct Sentencing Guideline computation for defendant Masilotti's criminal conduct is Level 37, with a Criminal History Category I.  The recommended sentence is 210-262 months' imprisonment.  The statutory maximum sentence for the defendant's offense is 60 months' imprisonment.

**C.**.     **Conclusion.**

The defendant received a substantial benefit for his immediate decision to 'throw in the towel' in this case through his plea to a one count Information under Section 371 which carries a maximum sentence of 60 months' imprisonment.  As set forth in the Plea Agreement, the United States decided to forego other substantive charges which could have resulted in a more severe sentence being meted out (*See* Plea Agreement, ¶ 9).  However, in this public corruption case, the benefits to the government and the public of the defendant's immediate decision to plead guilty, forego discovery, accept punishment for his conduct, and forfeit his ill-gotten gains cannot be overstated.  Those important benefits include significant and immediate deterrence to other public officials and the confidence the public gains by the immediate removal from public office without false denials of innocence through protracted litigation of a corrupt public official.

The Sentencing Guideline recommended sentence is presumptively reasonable.  The Court-accepted Plea Agreement reflect the parties position that Masilotti has already received the benefit

for his early acceptance of responsibility in that it requires Masilotti to recommend a sentence of 60 months' imprisonment (*See* ¶¶ 6, 10) in which sentence recommendation the United States concurs. The United States respectfully suggests that any lesser sentence would be unreasonable, inappropriate, counter to the mandates of Section 3583, and not adequately punish Masilotti's egregious behavior while in public office.

Respectfully Submitted,

R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY


s/ John S. Kastrenakes
By:    John S. Kastrenakes
Assistant U.S. Attorney
Fla. Bar. No. 312827
500 South Australian Avenue
Suite #400
West Palm Beach, FL 33401
Tel:    (561) 659-4772
Fax:    (561) 659-4526


/s/ Stephen Carlton
By:    Stephen Carlton
Assistant U.S. Attorney


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 27, 2007, I electronically filed the foregoing Government's Response to Objections to PSR and Sentencing Memorandum with the Clerk of the Court using CM/ECF.


s/ John S. Kastrenakes
Assistant U.S. Attorney


13

SERVICE LIST

John S. Kastrenakes, Assistant U.S. Attorney
john.kastrenakes@usdoj.gov
500 S. Australian Ave., Ste. 400
West Palm Beach, FL 33401
Tel:     (561) 820-8711
Fax:     (561) 659-4526
Attorney for Plaintiff United States
[Service via CM/ECF]

Howard Srebnick, Esq..
201 South Biscayne Blvd., Ste. 1300
Miami, Florida 33131
Tel:     (305) 371-6421
Fax:     (305) 358-2006
srebnick@royblack.com
Attorney for Defendant Masilotti
[Service via CM/ECF]

Marcos Beaton, Esq.
201 South Biscayne Blvd.
Suite #1300
Miami, Florida 33131
Tel:     (305) 371-6421
mbeaton@royblack.com
Attorney for Defendant Masilotti
[Service via CM/ECF]

John F. O'Donnell, Esq.
2850 N. Andrews Avenue
Fort Lauderdale, Florida   33311
Tel:     (954) 563-9993
Fax:     (954) 566-7754
odonnellj@bellsouth.net
Attorney for Defendant Masilotti
[Service by CM/ECF]

Kito J. Bess
United States Probation Officer
501 South Flagler Drive, Ste. 400
West Palm Beach, Florida 33401
Tel:     (561) 804-6884